John Briggs for the appellant Hexcel. I'd like to reserve two minutes for rebuttal if I can. The legal framework applied by the district court, the architecture, is the main beef that we have as a matter of law here. The court avoided deciding some important issues of process and law. It has been Hexcel's uncontroversial position from the very beginning that, number one, the statute of limitations is equitably told in view of the conspirator's successful fraudulent concealment. Let me just stop you for a second here. You've got Conmar. Yes. And you seem to rely on that a lot. But looking at this from a practical perspective, your client was, and I'm using the term in the broader sense, was a co-conspirator with this. It was likewise sued. Its deposition was taken, sued by other people for the very thing that you now want to sue or that you've sued. Not at all. It was sued for something quite different. It was sued for price fixing based on the receipt of a grand jury subpoena and nothing else in connection with its prepreg business, which is a consumer of carbon fiber. That was the main reason for Hexcel's. So from your perspective, the wrongs for which your client was sued are very different from the ones for which you're seeking relief. Is that your petition? They are completely different, with one exception. We were made a defendant in some suits that alleged price fixing both in prepreg and carbon fiber. But for most of the period of time, we weren't even in the carbon fiber business. We were only in the prepreg business, and we were the world's largest or the nation's largest purchaser of carbon fiber. Are any of the other original defendants also suing BP? They have, and they settled. They settled. Yes. You don't know what the terms were. I don't know. It's off record. We don't need to know either. I don't think the public, my colleague could say if he wanted to. Okay. All right. I didn't mean to interrupt you, but I just want to be sure I understand the context. So your position is that the reason why we can't just say, come on, give me a break, is because the wrongs that you were sued for initially are different from the ones about which you complain here. They were, but even if they were the same, I don't think it would affect the analysis, but they're different as a factual. Well, yes and no. I mean, if you were doing the same things and you were in a conspiracy to do them, it kind of sits ill to turn around and sue your co-conspirator claiming that you didn't know about it. Indeed it would, and that would be a very nice fact question for the jury, and I'm sure if the case ever gets there that BP would argue something along those lines. That's basically what the district court's position was. No, that's not. I don't think so. Okay. What's the district court's position? I'm not 100 percent sure I can explain that with the clarity I'd like to, but I can tell you what the district court didn't do and what the Supreme Court said it should have done and what this court has said it should have done. And what it should have done is ask the question, there's lots of evidence of fraudulent concealment. There's no question that BP and its co-conspirators buried the evidence, threw dirt on it, and left it to be hidden. And they kept it hidden for a long time. That's one reason this case is so old. At that point, the law requires the equitable tolling of the statute up until the fraud is discovered, the facts constituting the violation are discovered. Let me just stop you here one more time. I apologize. But my understanding is that Hexel has agreed that it knew about two critical agreements between BP, Amico, and Torrey during the early 90s, specifically the distribution agreement under which BP, Amico purchased and resold carbon fiber manufactured by Torrey and the licensing agreement under which BP, Amico used Torrey technology to manufacture certain carbon fiber products. Is that correct? We knew, Hexel knew about the intellectual property agreement, the distribution agreement, intellectual property licensing agreement, and it knew that with respect to 3K and 6K fiber, Torrey and BP were acting as one in their competition with Toho. We knew that. Okay. And there was also, there was a grand jury subpoena dealing with essentially the same claim that you are now asserting. Is that correct? No, it's not correct. It's not. It wasn't dealing. The grand jury subpoena asked for documents. It said give us documents regarding your prepreg and also give us documents regarding other carbon products, which included necessarily carbon fiber the way it was defined. That's all we got. We got, we said we have questions for you. That was the grand jury subpoena. Why aren't the two things that Judge Smith asked you about enough for constructive knowledge or inquiry notice? The important thing about that date is it's not the cutoff date for filing a lawsuit. It's the date when limitation starts to run. And you've got four years from that date. So. Well, that's the issue. There's two questions there. We agree that we had, we were on inquiry notice as of the receipt of the grand jury subpoena. We do not agree that inquiry notice and constructive knowledge or actual knowledge mean anything like the same thing. The Supreme Court said they don't. This Court has said they don't. Actual knowledge means something. It means, according to the Supreme Court in Merck, the facts constituting the violation. This Court in Conmar said it means facts giving rise to the claim. This Court in E.W. French, the most recent statement, says it means the facts which form the basis of the action. What does that mean? In Merck it meant scienter. The plaintiff discovered the cause of action when he had knowledge of the defendant's scienter. In an antitrust price-fixing case, it means knowledge of the agreement, the price-fixing agreement. I think there's merit to your argument that inquiry notice is not the same as constructive knowledge. But an additional element that's required for tolling by Conmar is duly diligent inquiry. Correct. And I'm not clear on why duly diligent inquiry would not have done the trick. Let me tell you something that influenced my thoughts about this. When the defendants entered into that mutual tolling agreement, that's after the relevant time. But they wouldn't have done it unless they thought, gosh, if we don't toll, agree to toll, we're going to sue each other now. And if we sue each other now, we'll hand the government its case on a silver platter. And I just work back from that. It means they knew, and they had already figured out for quite some time, that there was a big risk if they acquired the knowledge that you would acquire through discovery. The tolling agreement was entered into in 2003. Hexel had actual knowledge of the price-fixing agreement, actual knowledge, in February of 2001. It did not have actual knowledge before then. Hexel, excuse me, BP claims that we had actual or constructive knowledge. We did not have actual knowledge. And constructive knowledge is a very loose, loosey-goosey term. What should we or could we have known before February of 2001? You might ask my colleague what it is that we could have put in a complaint. What we would have put in a complaint, we assert that you assert in a price-fixing agreement against us because you got a grand jury subpoena and so did we. That's what we could have said. No more. We might have had rumors or we might have had suspicions. We didn't have the facts to stop the equitable tolling of the statute of limitations occasioned by their fraudulent concealment. We didn't fraudulently conceal. They buried the evidence deep in the ground. I want to ask you just one thing. We'll give you a little extra time here because we know we're running into your desired time here. But isn't CONMAR a little bit distinguishable because, in that case, the plaintiff was just a regular business customer relationship, had a business customer relationship, whereas here you were not only a manufacturer of the product but a supplier of the product involved in the price-fixing. Doesn't that help distinguish CONMAR a little bit? Not really. I mean, for most of the time we were just a customer, bear in mind. We became our competitor in the carbon fiber business in the late 1990s with the purchase of Hercules assets. But that's a distinction without a legal difference. It doesn't mean we had actual knowledge. It doesn't mean we had constructive knowledge. Once the ---- Had from 2001 to 2003. Well, I'm sorry. I will draw that. According to the Supreme Court's formulation in Merck, which is really important, which is completely congruent with this Court's decisions in French, E.W. French, in CONMAR and also in Madriaga, the statute started running in February of 2001. That's our position. If it started running substantially earlier than that, we're out of time and out of court under most formulations. But we're not arguing that. The legal structure of this analysis to us is vital, and the Merck decision lays it out clearly. And the Go Computer case relied on by BP is ---- and also relied on by the district court, by the way, is completely different. In Go ---- It's like people using the same language having different meanings, sort of like the Mad Hatter's Tea Party. In the Fourth Circuit, the word inquiry notice was used to mean constructive knowledge or actual knowledge. Why don't you say ---- We'll give you a couple of minutes on rebuttal, but let's hear from BP, and then we'll go from there. Thank you. I should say Ineos Polymers, but I keep thinking of BP. Fair enough. Good morning, Your Honors. My name is Scott Folks. On behalf of the Appellee, Ineos Polymers, Inc., which purchased the assets of BP Amico Polymers, Inc. So we do refer to our client as BP Amico in this case. Okay. You won't be offended, right? No. In fact, that's how in the briefing, BP Amico is how we've referred to ourselves. Going back to a few questions that were asked of my co-counsel, the prior suits were identical to the claims that are being made here. In 1996, Hexcel purchased the assets of Hercules, and it became a carbon fiber producer. It wasn't the late 1990s. It was 1996. And at that point, Hexcel was in the carbon fiber business, the same business that they alleged there was price fixing. So Hexcel made both carbon fiber and prepreg. And as Mr. Briggs noted, the suits alleged a conspiracy in both carbon fiber and prepreg. Those cases survived a motion to dismiss filed by Hexcel under Rule 12. You asked about Hexcel knowing about the prior agreements. They did. They knew about the distribution agreement that made BP the exclusive provider. They also knew about the market allocation in the licensing agreement, which made it improper for BP or under the contract. BP was barred from selling in Japan and France, and Torre was barred from selling certain products in the United States. That's exactly what they allege in paragraphs 22 and 23 of their complaint was an improper market allocation. And were those agreements – let me back up. They acquired Hercules. Was it Hercules that had much of this knowledge, and they were deemed to have – by acquiring it, they got that knowledge? Or this occurred after they acquired Hercules? No, this occurred when they got the – they were BP's biggest customer. Right. So they knew about the fact that BP got carbon fiber from Torre. Hercules. No, Hexcel. Oh, Hexcel. Hexcel was a prepreg producer, so they bought carbon fiber from BP. Right. They therefore knew that where BP was getting the carbon fiber was from Torre. So acquiring Hercules may have added to the quantum of information they had, but not to the substance of it, right? That's correct, although after they acquired Hercules, there was some joint venture discussions between BP and Hexcel. And at that time, BP told Hexcel about the distribution agreements – excuse me, the licensing agreements. And that became a problem in the joint venture discussions, which is all in the record, because Hexcel said this is a problem for us if we can't do a joint venture and then go sell in Japan. Help me with this on the record. I used to do a lot of transactions law, and I know that whenever you acquire somebody, you do a lot of – not discovery – a lot of due diligence. You look at all the records and all the documents, and you do corporate exams and all that sort of thing. I assume – and I don't know whether the record reflects this, but let me just ask, does the record reflect the fact that when Hercules was acquired that there was a lot of discovery or basically corporate exam-type work being done on both sides to see what was going on? We did serve discovery in the case on what Hexcel learned in its due diligence from the 1996 acquisition. And frankly, Your Honor, we didn't get much in the way of documents back on that perhaps because it was – That was before the days of electronic discovery, right? E-mails and things like that. So we do know what knowledge they're imputed to have, but we don't have – From your perspective, that discovery did not produce a treasure trove, right? We thought it might, but we had other treasures elsewhere, but not through the due diligence process. Okay. The grand jury claim that the court asked about, it was for price fixing and market allocation. It was not a completely different grand jury investigation. Hexcel was the subject of that grand jury investigation. BP was, and so were many other companies. I would point you to Hexcel's 10-K, which talks about the fact that the grand jury subpoena relates to the pricing of all manufacturers of carbon fiber and carbon fiber- What's the date of the 10-K? March 30th, 1999. That's an undisputed fact. Okay. There's also a memo in the file from Hexcel's lawyer, Rodney Jenks, to their insurance carrier dated March 29th – sorry, March 23rd, 1999. That's at Supplemental Excerpts of Record 339, and I quote, The subpoena reflects that the government has focused generally on issues relating to price fixing and market allocation in the carbon fiber and carbon fiber prepreg industries. That's from their own in-house counsel. They knew exactly what the grand jury subpoena was looking into. And if that timing shows actual or at the very least constructive knowledge, you win from your perspective, right? Yes, Your Honor, and our position is that was just the icing on the cake. They had a decade of red flags leading up to this. And the tolling agreement that you mentioned, the timing is not coincidental. The grand jury subpoena came in January of 1999. The tolling agreement was entered a week before, four years to the date of that, for exactly the reason Judge Kleinfeld asked about, which is that companies were contemplating suing each other and didn't want to do that in the context of ongoing litigation where we wanted to have a common front. Does the record disclose anything about the lawsuits that were filed by other co-conspirators against BP? I don't think there's any evidence in this record about that. There was one other one. It was brought by a company called Cytec, also a prepreg manufacturer. In that case, and I also represented BP in that litigation, in that case we didn't have the treasure trove of knowledge for summary judgment, number one. And number two, they didn't wait. Cytec terminated the tolling agreement. Cytec sued BP within the proper time limitations. We didn't have a statute of limitations argument, unfortunately, like we do here. And subsequently the case did settle. Could you comment on, I think you heard my question to counsel about the CONMAR case. That's obviously an important case from their perspective. Is that case distinguishable from the facts here, and if so, how? That's distinguishable in a certain way, in several ways. The prior lawsuits in that case involved a different product, steel nails, not PC strand, which was the subject of CONMAR's case. Your opponent claims that there are different products involved here as well. And I talked about that when I first stepped up there. They're not. The prior lawsuits were carbon fibers for fixing the price of carbon fibers and prepreg. So from what your co-counsel there indicated, they fall under the same general rubric, but they're talking about smaller portions within the subparts, right? But they're still carbon fiber products. As of 1990, well, there's carbon fiber and prepreg. Carbon fibers used to make prepreg. And the case has alleged price fixing in both products. And Hexcel made carbon fiber after 1996. Secondly, the plaintiff in that case, as I think you pointed out, had no business relationship with either Mitsui or with VSL, the defendants in the prior litigation. Here, Hexcel had a huge business relationship with BP for years and years and years, and as Mr. Briggs pointed out, was one of the biggest players in the industry for years. Thirdly, the prior indictments in the Conmar case involved a different antitrust theory, dumping, and did not involve the plaintiff, Conmar. Here we have a grand jury investigation involving the exact same issue, price fixing and market allocation, and involving the plaintiff, Hexcel. So I think the Conmar case is distinguishable. We do agree with the Conmar court's statement that the central question is when Conmar had actual knowledge of its antitrust cause of action and whether it should have been alerted to facts the following diligent inquiry would have put it on notice of its claim. So I think the court in Conmar set the standard out correctly. From your perspective, what's the best case to define what constructive notice means from your perspective? I think the person I just read from Conmar does have a good discussion of constructive notice, and that is whether when you're alerted to facts, the following duly diligent inquiry could have advised you of your claim. That's constructive knowledge. I see I'm running out of time. Let me just wrap up then if I could, please. This is a case, Your Honors, where we don't have to guess or speculate what the plaintiff knew or when it knew it. It's unlike other cases where there's a single press release or a single indictment and you're arguing about whether they knew about the press release or they were involved in the indictment or whether it was the same theory. Here we have Hexcel's own words and its own documents dating back over a decade. And all of this came before the grand jury subpoenas. They witnessed anti-competitive practices. They heard things about what was going on. They told their own lawyers at Skadden Arps about these things that they learned. We even know what Hexcel's own antitrust lawyer from Skadden concluded about when the statute of limitations would run. We don't have to guess here about whether the plaintiff was aware of the grand jury investigation or whether the investigation covered the same product. And we don't have to guess about whether the plaintiff knew about the other litigation when it was filed. The only thing we have to guess about is why they waited years and years to file a lawsuit, even after they had settled the claims against them in the mid-2000s. They waited three years. They even waited 75 days after BP terminated the tolling agreement, and that's a crucial 75 days that they waited too long. Thank you for your time. Thank you very much. Mr. Griggs, we'll give you a couple of minutes to respond, okay? Thank you. My friend and colleague, Mr. Crouch, has greatly overstated what Hexcel knew and when it knew it and has hotly disputed facts as revealed by the record. That's a common term in Washington, right? It's a common term. What he knew and when he knew it. Constructive knowledge means that a plaintiff should have known something, should have known, and had the means to find it out sooner. Actual knowledge means exactly what it says. Knew of the price-fixing agreement. That's what we had to know, just like the scienter in Merck. The licensing agreement that has been talked about is perfectly proper. There's no claim of illegality associated with any of that. The claim is that that was the lawful veil behind which the unlawful price-fixing agreement took place. That is the claim. Why wouldn't Hexcel have had its complaint prepared and ready to file? And why wouldn't it have filed it the day after the tolling agreement ended? There's a longer story about that than you would ever want to hear. It did and it wanted to and it would have. It never actually received the notice of the termination of the tolling agreement until we got a letter from Mr. Fauch telling us when we terminated it, that they'd already terminated it a couple months earlier. I hate to burn my time on that, but there was a mailroom issue at Skadden. So we did it. We were prepared to jump immediately, but immediately turned out to be different. But the formulation that I am proposing is the formulation, I think, compelled by the Supreme Court's decision in Merck. I don't believe that the Fourth Circuit's decision in the Fourth Circuit would ever decide go computer the way they did today. I don't think any court, any circuit court in this country, could treat inquiry notice as if it had anything to do with constructive knowledge or actual knowledge. The architecture of that framework is very clear. Now, in the— I hate to stop because you're a fine lawyer, but we did give you a couple of minutes. So we're going to thank you both for your fine arguments. We appreciate it very much. It's helped our understanding and deliberations. And we wish you a nice trip back to Washington and, Mr. Fauch, to Chicago. Thank you. Case of Hexel v. Indios, Innos, Polliners is submitted. And we will now hear argument in the case of United States v. Bailey.
judges: Fletcher, Kleinfeld, Smith